MR. JUSTICE DALY
delivered the opinion of the Court.
This is an appeal from the final judgment of the district court, Big Horn County, following a jury trial. Defendants Fitzpatrick and Radi appeal from judgments of conviction for deliberate homicide, aggravated kidnapping and robbery. Defendants Holliday and Bad Horse appeal from judgment of conviction for robbery.
On May 20, 1975, the State of Montana filed an Information charging defendants Fitzpatrick, Radi, Holliday, Bad Horse and Bushman with deliberate homicide, in violation of section 94-5-102(l)(a)(b), R.C.M.1947; aggravated kidnapping in violation of sections 94-5-303(1 )(b)(c), 94-5-303(2) and 94-5-304, R.C.M.1947; and robbery, in violation of section 94-5-401(l)(b), R.C.M.1947. The affidavit of probable cause indicates these charges stem from the April 5, 1975 robbery of the Safeway store in Hardin, Montana and the murder of Monte Dyckman, a Safeway store employee. Following defense motions for severance of trial, change of venue and disqualification of judges, trial was held in Billings, Montana in October 1975. Defendant Bushman testified in behalf of the state and was granted immunity from prosecution. At the conclusion of the state’s case-in-chief, all defendants rested without offering evidence. Defendants Fitzpatrick and Radi were found guilty of deliberate homicide, aggravated kidnapping, and robbery. Defendants Holliday and Bad Horse were found guilty only of robbery.
On October 29, 1975, defendants Fitzpatrick and Radi were each sentenced to 100 years imprisonment for the crime of deliberate homicide; 100 years imprisonment for the crime of robbery as persistent felony offenders pursuant to section 95-2206.5, R.C.M. *178 1947; and death by hanging for the crime of aggravated kidnapping. Defendants Holliday and Bad Horse were each sentenced to 40 years imprisonment for the crime of robbery. Defendants Radi and Fitzpatrick’s sentences of death were stayed by the district court pending appeal to this Court.
The district court file is deplete of any affidavit supporting this motion to discharge the jury panel. Absent such a showing of good cause to substantiate their motion, defendants cannot challenge the jury panel for the first time on appeal on the ground that the district court failed to select and draw jury panels in accordance with applicable Montana law. Ledger v. McKenzie, 107 Mont. 335, 85 P.2d 352; State v. Corliss, 150 Mont. 40, 430 P.2d 632. The means of establishing good cause, specifically the sworn affidavits of the chief deputy clerk of the district court of Yellowstone County and the Yellowstone County registrar of voters, were as accessible at the time of trial as at the time of appeal.
Yet, defendants; failure to comply with section 95-1908, will not foreclose our consideration of whether the jury panel was properly selected and drawn where the fundamental constitutional rights of the defendants are at stake. State v. Porter, 125 Mont. 503, 242 P.2d 984; State ex rel Henningsen v. District Court, 136 Mont. 354, 348 P.2d 143; State v. Chapman, 139 Mont. 98, 360 P.2d 703. Thus we consider the question of whether the selection of jurors and drawing of jury panels in the instant case infringed on defendants’ fundamental constitutional rights.
This Court has long held the accused in a criminal prosecution is constitutionally guaranteed a trial by an impartial jury selected and drawn in accordance with the law. State ex rel Henningsen v. District Court, supra; State v. Hay, 120 Mont. 573, 194 P.2d 232; Dupont v. McAdow, 6 Mont. 226, 9 P. 925. Any material deviation or departure in procuring a jury has been held to constitute a denial of fundamental constitutional rights. State v. Porter, supra; State v. Groom, 49 Mont. 354, 141 P. 858; State v. Tighe, 27 Mont. 327, 71 P. 3; reversed on other grounds 35 Mont. 512, 90 P. 981.
*179 The Revised Codes of Montana are explicitly clear in defining the procedure to be followed in selecting jurors and drawing jury panels. Section 93-1301, R.C.M.1947, provides that registered electors whose names appear on the most recent list of all registered electors, as prepared by the county registrar, are competent to serve as jurors. Section 93-1401, R.C.M.1947, provides that a list of persons to serve as jurors must be prepared by the chairman of the county commissioners, or in his absence, any member of the board of county commissioners, the county treasurer and the county assessor or any two of such officers. Once the jury list is composed, section 93-1402, R.C.M.1947, requires that each name on the list be assigned a number and the list of the names of the persons be delivered by those officers to the clerk of the district court pursuant to section 93-1403, R.C.M.1947. Section 93-1404, R.C.M.1947, mandates that the clerk of court place the individual pieces of paper, embossed with the number assigned each juror, in a box and from this box the numbers are to be drawn by the district judge in the presence of the clerk of court pursuant to section 93-1502, R.C.M.1947. Section 93-1512, R.C.M.1947, provides that in the event additional jurors are needed, their numbers must also be drawn by the district judge.
Defendants contend section 93-1301, regarding the competency of jurors, is unconstitutional in that voter registration lists fail to provide a true cross-section of the community in violation of equal protection requirements of the state and federal constitutions. It is argued the voter registration system excludes residents who are qualified for jury service, but are not qualified to vote or do not choose to vote. The issue of whether voter registration lists are a proper instrument for selecting jurors was recently discussed in United States v. Colon, D.C., 415 F.Supp. 459, 464:
“From a constitutional standpoint it is well settled that voting lists may be used as a basis for jury selection unless it appears that in the community there is systematic, intentional and deliberate exclusion from those lists of a particular economic, social, religious, racial, geographical or political group.” [Citing cases.]
*180 From Colon and Foster v. Sparks, 5 Cir., 506 F.2d 805, we glean the prima facie case for establishing a statutory challenge to a jury selection system on the ground of jury composition: 1) Proof that the jury selection system is disadvantageous to a cognizable class, and 2) proof that the disadvantage is occasioned by discrimination in the selection process.
Defendants bear the burden of establishing the cognizable class which is discriminated against by the jury selection process. Purposeful discrimination may not be assumed or merely asserted. Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759; Smith v. Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84. Defendants’ only allegation of discrimination was that the jury panel was composed of all whites, with the exception of two Indians, and that the convicting jury was exclusively white in composition. Such allegation falls short of establishing a prima facie case challenging the jury selection system on the ground of racial composition. Petition of Boe, 156 Mont. 303, 481 P.2d 45; State v. Johnson, 149 Mont. 173, 424 P.2d 728. It is a well accepted proposition of law that the voter registration list, from which the jurors are selected, and the jury panel need not perfectly mirror the racial composition of the community. Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690; Foster v. Sparks, supra; State v. Taylor, 168 Mont. 142, 542 P.2d 100.
Defendants further contend the jury panels in the instant case were selected and drawn in total disregard of the applicable Montana law. We find merit in defendants’ claim that the manner in which jurors were selected and drawn substantially deviated from the procedures mandated in Title 93, Revised Codes of Montana, 1947. Specifically, all duties delegated to the jury commission and district court judge were performed by the clerk of court without any apparent overseeing. While we have no cause to question the good faith of the public officers involved, it is obvious the statutory scheme for selecting and drawing a jury was completely circumvented. The rule in Montana is that juries must be selected and drawn in substantial compliance with the law. Where the dis *181 regard for legislative mandates amounts to more than technical irregularity substantial compliance has not been achieved. State ex rel Henningsen v. District Court, supra; State v. Porter, supra. We stated initially that this matter was not properly raised on appeal, but it is of sufficient import to warrant a full discussion for future guidance.
Issue II. Defendants contend that the joinder of their trials, after timely and specific filing of motions for severance, brought about these errors:
1. The jury was allowed to consider hearsay evidence which was inadmissible against certain defendants, yet admissible against others.
2. The admission of hearsay evidence denied individual defendants their fundamental constitutional right to confrontation under the Sixth Amendment of the United States Constitution.
3. The joinder of defendants’ trials denied defendants their right to effective assistance of counsel.
The only specific example of the admission of extrajudicial hearsay cited to us is Bushman’s testimony of statements allegedly made by defendant Radi. Bushman testified these statements were made at Radi’s home in Billings on April 6, 1975, at approximately 2:30 a.m., several hours after the commission of the alleged crimes. All of defendants, with the exception of Fitzpatrick, were present when the statements were made. Bushman testified Radi stated:
“A. ‘Fitz didn’t have to shoot the kid.’
“A. * * * he said, ‘Fitzpatrick is pretty pissed off.’ he said, ‘He is uptown getting drunk because him having to shoot the kid for nothing because there was no money in the bag.’ ”
The court’s Instruction No. 1, stated:
“You are instructed that where one defendant testifies about what was said by a second defendant, it is ordinarily not admissible as evidence against any other defendant if that other defendant was not present at the time and place where it was said.
*182 “Flowever, what is said is admissible against the defendants that are present when it is said.
“In your deliberation, you are not to consider what was said against any defendant who was not present at the time and place where it was said.
“You may consider what was said as evidence against those defendants present at the time and place it was said.
“The reason for this is that a defendant who is not present when something was said about him, cannot, of course, deny that it was said because it is quite obvious he was not there to know the facts. Therefore, you will not use it as evidence against him.”
Defendants contend the instruction of the district court was insufficient and failed to erase from the minds of the jurors the crucial and devastating prejudice naturally flowing from the testimony.
In support of their argument defendants cite Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476. In Bruton the codefendants Bruton and Evans were tried jointly and convicted of armed postal robbery. During the trial a postal inspector testified Evans confessed that Bruton and Evans committed the robbery. Evans’ conviction was later reversed because the oral admission had been elicited by police officers in disregard of Evans’ Miranda rights. Bruton’s conviction was upheld on the theory the trial court sufficiently instructed the jurors not to consider Evans’ confession as evidence against Bruton. The United States Supreme Court disagreed and reversed Bruton’s conviction stating:
“* * * because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner’s guilt, admission of Evans’ confession in this joint trial violated petitioner’s right of cross-examination secured by the Confrontation Clause of the Sixth Amendment.” 391 U.S. 126, 88 S.Ct. 1622.
In a footnote, the Court said:
“We emphasize that the hearsay statement inculpating petitioner *183 was clearly inadmissible against him under traditional rules of evidence * * * the problem arising only because the statement was * * * admissible against the declarant Evans. * * * There is not before us, therefore, any recognized exception to the hearsay rule insofar as petitioner is concerned and we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause.” 391 U.S. 128, 88 S.Ct. 1623.
The state argues Bruton is distinguishable from the instant case since the hearsay statements testified to by Bushman were admissible under the coconspirator exception to the hearsay rule. Section 93-401-27, R.C.M. 1947, provides in part:
“Facts which may be proved on trial. In conformity with the preceding provisions, evidence may be given upon a trial of the following facts:
“6. After proof of a conspiracy, the act or declaration of a conspirator against his coconspirator, and relating to the conspiracy.”
The state further argues even if Radi’s declarations were not admissible under the coconspirator exception to the hearsay rule, they were admissible under section 93-401-7, R.C.M.1947, which provides:
“Declarations which are a part of the transaction. Where, also, the declaration, act, or omission forms part of a transaction, which is itself the fact in dispute, or evidence of that fact, such declaration, act, or,omission is evidence, as part of the transaction.”
The state contends the coconspirator exception to the hearsay rule is available in this case, since the state prosecuted the case on the theory there was a conspiracy to commit robbery. It is argued that, even though the crime of conspiracy was not charged as a separate offense in the Information, the state could properly present evidence to show there was a conspiracy. Defendants urge the state is barred from utilizing the coconspirator exception to the hearsay rule since the state did not charge defendants with the crime of conspiracy; that the state;s evidence was insufficient to prove a conspiracy; and, that the hearsay statements testified to by *184 Bushman were made after the conspiracy ended, if there was one, and were not made in furtherance of a conspiracy. We disagree with defendants’ interpretation of the coconspirator exception to the hearsay rule.
The state may present evidence establishing a conspiracy even though the crime of conspiracy was not charged as a separate offense in the Information. State v. Dennison, 94 Mont. 159, 21 P.2d 63. Whether or not a conspiracy was proved for the purpose of permitting application of the coconspirator exception to the hearsay rule was a question to be decided by the district court. The existence of a conspiracy can be shown by circumstantial evidence. To establish a conspiracy it is not necessary to prove by direct evidence an agreement to commit a crime. State v. Alton, 139 Mont. 479, 365 P.2d 527; State v. Collins, 88 Mont. 514, 294 P. 957; State v. Hopkins, 68 Mont. 504, 219 P. 1106.
An examination of the record discloses that the district court made a finding, without a disclosure of its grounds, concerning the admissibility of extrajudicial statements made by a defendant against a nonpresent codefendant, by another codefendant. The court admitted the testimony, then admonished the jury by its Instruction No. 1 (heretofore cited in full) that the statement could not be used against a codefendant not present when the statement was made. This procedure was approved by the United States Supreme Court in Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278. In Paoli a confession of one defendant was admitted inculpating the other defendants. A five-four Court approved the giving of a cautionary instruction, if sufficiently clear, and reasoned that it could be assumed the jury would follow the court’s instruction.
Yet, this started a series of cases based on the Sixth Amendment command that all defendants in a criminal prosecution shall enjoy the right to confront the witnesses against them. In 1968, Bruton presented a fact situation where Bruton was jointly tried with a co-defendant named Evans and convicted of robbery. A postal inspector testified at trial that Evans had orally confessed to him and also *185 implicated Bruton. The United States Supreme Court held this added substantial weight to the case in a form not subject to cross-examination, since Evans did not take the stand. The Court of Appeals, Eighth Circuit, 375 F.2d 355, set aside the Evans conviction for a “Miranda” violation but affirmed the conviction of the nonconfessor Bruton. The court relied on Paoli because the jury was instructed not to consider Evans’ confession in determining Bruton’s innocence or guilt.
The Supreme Court in Bruton specifically overruled Paoli and challenged the naive assumption the prejudicial effect of such testimony could be overcome by jury instructions. The Court held that since substantial weight was added to the government’s case by the testimony in a form not subject to cross-examination, Bruton’s Sixth Amendment right to confront witnesses against him was violated, and the violation was not cured by the court’s instruction to disregard the testimony of the postal inspector concerning Evans’ confession inculpating Bruton. For a case by case examination of the application of the “Bruton rule” see Harrington v. California (1969), 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284. In Harrington there are demonstrations of constitutional violations of the “Bruton rule”, in Bruton type situations where it is not reversible error. We do not find these exceptions present in the fact situation in the instant case.
The United States Supreme Court has long recognized the right of the defendant to confront his witnesses at the time of trial. In Mattox v. United States, 156 U.S. 237, 242, 243, 15 S.Ct. 337, 339, 39 L.Ed. 409, 411, the Court said:
“The primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand *186 and the manner in which he gives his testimony whether he is worthy of belief. * * *”
The United States Court of Appeals in United States v. Adams, 9 Cir., 446 F.2d 681, 683, cert. den. 404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 257, found the relevant factual inquiry in determining whether the Confrontation Clause is violated to be:
“* * * whether, under the circumstances, the unavailability of the declarant for cross-examination deprived the jury of a satisfactory basis for evaluating the truth of the extrajudicial declaration.”
 The criteria to be considered in making this factual inquiry are: (1) the declarant’s knowledge of the identities and roles of the other coconspirators; (2) the possibility that declarant was relying on faulty recollection; (3) the circumstances under which the statements were made, indicating declarant might be lying about the codefendant’s involvement in the crime; (4) the possibility defendants could have shown by cross-examination the declarant’s statements were unreliable; and (5) whether the testimony is so “crucial” to the prosecution of “devastating” to the defense as to require reversal of the conviction. United States v. Snow, 9 Cir., 521 F.2d 730; United States v. Baxter, 9 Cir., 492 F.2d 150, cert. den. 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292. Whether a defendant was denied the right to confront and cross-examine witnesses must be resolved case-by-case, based on an examination of all the circumstances and evidence. Arias v. United States, D.C., 388 F.Supp. 736.
There is little doubt that declarant Radi clearly knew Fitzpatrick’s role in the alleged crime and the identities and roles of the other conspirators. The events were fresh in his mind. Yet, without discussing the truth and veracity of the declarant, we recognize that Radi had good reason to lie about who shot the victim. Without Fitzpatrick present, Radi might easily persuade his coconspirators that all fatal shots were fired by Fitzpatrick and thus avoid some conceived criminal culpability. In any event, we recognize the devastating effect this testimony would have upon a jury and hold, at least as to Fitzpatrick, there was a denial of the right to *187 confront the declarant on cross-examination before the trier of fact. The district court’s instruction admonishing the jury was insufficient as far as offsetting any prejudice which resulted from the admission of the extrajudicial statements. Bruton v. United States, supra; Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100.
 We acknowledge the inherent discretion of the district court in determining whether defendants jointly charged with public offenses are to be proved separate trials or tried jointly. However, we recognize a need for judicial guidelines in the instance where the prosecution intends to introduce into evidence the extrajudicial statement of one defendant that implicates a codefendant. This issue was discussed in People v. Aranda, 63 Cal.2d 518, 47 Cal. Reptr. 353, 360, 407 P.2d 265, 272:
“When the prosecution proposes to introduce into evidence an extrajudicial statement of one defendant that implicates a codefendant, the trial court must adopt one of the following procedures: (1) It can permit a joint trial if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted without prejudice to the declarant. By effective deletions, we mean not only direct and indirect identifications of codefendants but any statements that could be employed against nondeclarant codefendants once their identity is otherwise established. (2) It can grant a severance of trials if the prosecution insists that it must use the extrajudicial statements and it appears that effective deletions cannot be made. (3) If the prosecution has successfully resisted a motion for severance and thereafter offers an extrajudicial statement implicating a codefendant, the trial court must exclude it if effective deletions are not possible. Similar rules concerning joint trial have been adopted in other jurisdictions and have been found workable. [Citing case.]” 47 Cal.Rptr. 360, 407 P.2d 272.
We are in agreement with the effect of these judicial guidelines.
Our final inquiry in this area of joinder concerns defendants’ contention the joinder of their trials denied them the effective *188 assistance of counsel. Defendants claim: (1) The number of defendants and independent counsel made it impossible to employ effective trial tactics; (2) one defendant or another disqualified a district judge or challenged a juror that another defendant would have allowed to remain in the case; (3) certain counsel delved into areas on cross-examination that merely repeated the state’s case against particular defendants; and (4) all defendants, with the exception of Radi, elected to rest their cases following the state’s case-in-chief, thus compelling Radi to rest. We note that most of these objections are of a general nature and could be raised in almost any multiple defendant-counsel proceeding. It would be most unusual, in our opinion, if four defense counsel representing individual clients did agree on every question of trial tactics. Further, a defendant has no right to have his case tried by a specific judge or have a particular person sit on his jury. State v. Moran, 142, Mont. 423, 384 P.2d 777.
In concluding discussion of the issue of joinder, we reiterate our position. Defendants incurred substantial prejudice through the joinder of their trials because of a failure to protect individual defendant’s right to confrontation. We fully realize the benefits of joint trials, specifically, the conservation of state funds, diminished inconvenience to witnesses and public authorities, and the avoidance of delay in bringing those accused of crime to trial. Yet, where we obtain speed, economy and convenience in the administration of the law at the cost of fundamental constitutional rights, that price is too high. Trial courts must examine joinder of defendants’ trials more closely, particularly where separate counsel is required because of potential conflicts of interest between the defendants.
Issue III. This issue attacks the sufficiency of evidence which the state presented to corroborate Bushman’s testimony. Section 95-3012, R.C.M.1947, provides:
“Testimony of person legally accountable. A conviction cannot be had on the testimony of one responsible or legally accountable for the same offense, as defined in section 94-2-106, unless he is cor *189 roborated by other evidence, which in itself, and without the aid of the testimony of the one responsible or legally accountable for the same offense, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, it merely shows the commission of the offense, or the circumstances thereof.”
In State v. Orsborn, 170 Mont. 480, 555 P.2d 509, 514, this Court said:
“State v. Cobb, 76 Mont. 89, 92, 245 P. 265, has been cited many times as to the general guidelines for determining the sufficiency of evidence corroborating the testimony of one legally accountable. Though Cobb was decided under section 11988, R.C.M.1921, since repealed, the language of the old statute is nearly identical to that of section 95-3012, R.C.M.1947, in pertinent part. * * *”
State v. Cobb, 76 Mont. 89, 92, 245 P. 265, 266, set out these general rules:
“(a) The corroborating evidence may be supplied by the defendant or his witnesses.
“(b) It need not be direct evidence — it may be circumstantial.
“(c) It need not extend to every fact to which the accomplice testifies.
“(d) It need not be sufficient to justify a conviction or to establish a prima facie case of guilt.
“(e) It need not be sufficient to connect the defendant with the commission of the crime; it is sufficient if it tends to do so.
“(f) Whether the corroborating evidence tends to connect the defendant with the commission of the offense is a question of law, but the weight of the evidence — its efficacy to fortify the testimony of the accomplice and render his story trustworthy — is a matter for the consideration of the jury.”
At trial the state presented two minor girls who testified they were with all five defendants on the day of the robbery and murder. The girls testified all five defendants planned to go to Hardin and the girls themselves accompanied Bushman, Bad Horse *190 and Holliday on the trip to Hardin and the return trip to Billings, at about midnight on April 5, 1975; that Fitzpatrick and Radi were in Radi’s automobile at a service station in Billings just before Bushman, Holliday, Bad Horse and the two girls left for Hardin; that Radi’s automobile passed them on the highway to Hardin; and that two men, who the girls presumed to be Radi and Fitzpatrick, got out of Radi’s automobile in Hardin. Both girls testified they observed a hole in the windshield of Radi’s automobile on the morning following the crimes.
Carol Broach testified Bushman, Bad Horse and Holliday were in Hardin from approximately 10:45 p.m. to midnight on April 5, 1975; that she returned to Billings with these three defendants and the two minor girls; and, that this group arrived at Radi’s house at approximately 2:00 a.m. on April 6, 1975.
Raleigh Kraft, Jr. testified he had discussed with Bushman and Bad Horse the possibility of robbing the Safeway store.
Ronald Potts and Lyle Doane testified they were customers at the Safeway store on the evening of April 5, 1975, and observed an automobile, blue or green in color, parked in front of the Safeway store, with two male occupants approximately the same ages as Radi and Fitzpatrick. Radi’s automobile was metallic blue in color.
Agent Dieckman of the Federal Bureau of Investigation testified Fitzpatrick was arrested in Spokane, Washington on June 3, 1975, and Fitzpatrick told him he had been drinking with Radi in Billings on the evening of April 5. The witness established that Fitzpatrick used a fictitious name while in Spokane and possessed a newspaper clipping stating Fitzpatrick was wanted by the police for the crimes committed in Hardin on April 5, 1975.
Robert Balko, employed by Nyquist Financial Services in Billings, testified Radi indicated in a conversation with him that someone had shot a hole through his windshield. The testimony of Mary Jenkins and Helen Jones established that Radi had changed his Montana automobile license plates for Nevada license plates shortly after the crimes.
*191 Roger Asbury of the Federal Bureau of Investigation testified the bullet found in Radi’s automobile was fired from the same gun as the slug found in the victim’s automobile and the slug which killed the victim.
This evidence sufficiently corroborates Bushman’s testimony.
Issue IV. The final issue we will consider is whether the convictions of defendants Holliday and Bad Horse should be reversed on the ground the jury was inadequately instructed on the applicable law and returned inconsistent verdicts. Holliday and Bad Horse contend that since the state prosecuted its case on the theory of conspiracy it is logically inconsistent to find them guilty of robbery, but not guilty of deliberate homicide and aggravated kidnapping. In support of this contention defendants direct our attention to the court’s Instruction No. 28, an instruction on the felony-murder doctrine, which provided:
“You are instructed that when two or more persons agree to commit a crime under such circumstances as may * * * result in the taking of human life, either in the furtherance of, or the resistance to their unlawful agreement, then each party * * * will be held responsible for the consequences which might reasonably be expected to flow * * * from carrying into effect their unlawful agreement * * *.
“The law is that, if two or more persons agree to commit a felony and death happens in the furtherance of the common object, all are alike guilty of the homicide. The act of one of them done in the furtherance of the original design, in the contemplation of the law, is the act of all. And if such an agreement is to do or perform an unlawful act constituting a felony, and in the prosectuion of such unlawful act constituting a felony, an individual is killed, such killing is deliberate homicide.”
A general principle of law is that consistency in criminal verdicts is unnecessary. Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356. Where two or more defendants are tried together in a criminal case the verdicts need not demonstrate rational consistency. United States v. Anderson, 165 U.S.App.D.C. *192 390, 509 F.2d 312, cert. den. 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672. The united States Supreme Court explained the rationale for the Dunn holding when it said:
“That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters.” 284 U.S. 394, 52 S.Ct. 191.
Defentands Holliday and Bad Horse distinguish Dunn from the instant case. They contend the jury in Dunn correctly followed the instructions of law given to it in reaching that verdict, but the jury here when finding Holliday and Bad Horse not guilty on two counts and guilty on the other count, completely disregarded Instruction No. 28 and relied on Instruction No. 36 which provided the jury might “find any one of the following verdicts” as to each defendant:
1. Guilty of Count One, deliberate homicide;
“2. Not guilty of Count One, deliberate homicide;
“3. Guilty of Count Two, aggravated kidnapping;
“4. Not guilty of Count Two, aggravated kidnapping;
“5. Guilty of Count Three, robbery;
“6. Not guilty of Count Three, robbery;
The jury verdicts returned in this case can be distinguished from the inconsistent verdicts which were the subject of the general rule announced in Dunn. These verdicts are not merely inconsistent, they are legally unsupportable. This case was prosecuted on a conspiracy to commit robbery theory and each defendant prosecuted under the felony murder rule or doctrine which contemplates, as set forth in the trial court’s Instruction No. 28, that each defendant is guilty of deliberate homicide or must be acquitted.
This jury was improperly and inadequately instructed on that point of law and could not reach a proper verdict. State v. Bean, 135 Mont. 135, 337 P.2d 930; State v. Jackson, 88 Mont. 420, 293 P. 309.
*193 The inconsistency between the court’s Instruction No. 28 and Instruction No. 36 is apparent and the resulting confusion in the minds of the jury is evidenced by its request for clarification of Instruction No. 28:
“Question on Instruction #28
“If we find one defendant guilty of robbery does Inst. No. 28 require guilty verdict on two remaining counts.”
The district court responded:
“Instruction number 36 answers this question.”
No further clarification was provided, the jury completed deliberation and reached its verdict.
This Court has held that the need for giving additional instructions to the jury is a matter of district court discretion. State v. Hawkins, 165 Mont. 456, 529 P.2d 1277. However, here the jury was directed to examine Instruction No. 36, which is an improper instruction contrary to the law of the case. The court should have further instructed the jury in a manner that would sufficiently and clearly present the applicable law. Such failure is reversible error.
The judgments of conviction of all defendants are reversed. The causes are remanded to the district court for new trials.
MR. CHIEF JUSTICE HATFIELD, and JUSTICES HASWELL and SHEA, concur.